UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

**Hon. Hugh B. Scott**

**14CR126S**

v.

**Report
&
Recommendation**

ARCHIE PHILLIPS,
BEVERLY FIELDS,

Defendants.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(C)
(Docket No. 6). The instant matters before the Court are the dispositive portions of the omnibus
motions of defendant Archie Phillips (Docket Nos. 57, 71) and Beverly Fields (Docket No. 55).
Fields seeks suppression of physical evidence and of her statements (Docket No. 55). Fields
scheduled a plea hearing on November 30, 2017 (Docket No. 147). As a result, this Report will
not address Fields' motion.

Phillips, meanwhile, seeks suppression of statements, of evidence obtained from the
search of 328 Landon Street, Buffalo, New York, evidence from an eavesdrop warrant, and of
statements from his proffer when he was represented by Mark Allenbaugh, an attorney
suspended from practice before this Court (Docket Nos. 57, 71). A separate Order (Docket No.
143) addressed the non-dispositive relief sought in these motions (Docket Nos. 55, 57).

The Government has filed responding papers (Docket No. 61, Gov't Response to Phillips (hereinafter "Gov't Phillips"); Docket No. 62, Gov't Response to Fields ("Gov't Fields")). The parties then supplemented and replied (Docket No. 60, Phillips Atty. Affirm. (with Ex. A, Phillips' Affirmation, dated June 8, 2016); Docket No. 63, Fields Reply; Docket No. 67, Affirm. of Shirley Tillmon (Phillips' mother), sworn to June 28, 2016; Docket No. 68, Fields Aff., sworn to July 1, 2016; Docket No. 71, Phillips Supp'al Motion to Suppress; Docket No. 79, Gov't Response to Phillips Supp'al Motion; Docket No. 80, Gov't Response to Fields' Reply; Docket No. 84, Phillips Reply (with exhibit); Docket No. 88, Phillips [Second] Reply (with Ex. A, Phillips Aff., sworn to Sept. 26, 2016); Docket No. 89, Phillips [Third] Reply (with Ex. A, Shirley Tillmon Aff., sworn to Sept. 30, 2016)). These items focused on the suppression motions. Oral argument was heard on June 28, 2016 (Docket No. 65), after resolution of issues surrounding Phillips' legal representation (see Docket Nos. 50-51, 53-54), and hearings were ordered (Docket Nos. 91, 92). Suppression hearings were held on May 4, 2017 (Docket Nos. 121 (minutes, May 4, 2017), 127, (transcripts, May 4, 2017), 119, Phillips' Witness List; see also Docket Nos. 93, 94, 98, 99, 103-05, 111, 113, 115, 117, 122, 123-25 (motions seeking adjournment, Orders resetting the hearings, and conference regarding representation that delayed the hearing), and concluded on July 6, 2017 (Docket Nos. 126 (minutes, July 6, 2017), 128 (transcripts, July 6, 2017)). The parties then submitted timely post-hearing submissions (Docket Nos. 137, Government's Post-Hearing Memo.; 135, Fields Post-Hearing Memo.; 136, Phillips Post-Hearing Memo.[1]).

---

[1]Contrary to this Court's Local Criminal Rules, W.D.N.Y. Loc. Cr. R. 49(d)(5), Phillips did not consecutively paginate this memorandum.

Philips also submitted ex parte and pro se his affidavit and an affidavit of another person directly to Chambers apparently in support of his suppression motion. A status conference was held on October 25, 2017, and those documents were returned to Phillips not considered by this Court (Docket Nos. 142 (minutes); see Docket No. 138, 140-41). This Court believed that the parties submitted these motions as of October 25, 2017 (Docket No. 142).

Phillips moved to suppress wiretap evidence based upon a wiretap application (Docket No. 71), but that application was not included in the moving or responding papers to this motion. This Court ordered production of the wiretap application (Docket No. 144) and set a deadline of November 17, 2017, for its production (Docket No. 145). The application was provided to Chambers on November 13, 2017, and the parties thus submitted the pending suppression motions as of November 13, 2017 (Docket No. 146).

## BACKGROUND

Defendants are charged with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Docket No. 1, Indict.). From early 2012 to April 3, 2013, defendants allegedly conspired to distribute cocaine (id.). The suppression stems from the search of 328 Landon, in which agents found marijuana. According to the Report of Investigation (Docket No. 61, Gov't Phillips, Ex. B[2]), agents asked and obtained Fields' written consent to search 328 Landon (id.). There, the search uncovered about two ounces of marijuana (Docket No. 128, July 6, 2017, Tr. at 81 (Mulhern)); a receipt to a rented storage area in Houston, Texas, rented by Fields; and a cell phone belonging to John Taylor (id. at 2; see Gov't Ex. 7; Docket

---

[2]This is the same as Docket No. 55, Fields Motion, Ex. A.

No. 61, Gov't Fields, Ex. G).  Fields then stated that she would not take the blame for Taylor or

Phillips' drug trafficking, saying that Taylor obtained large shipments of cocaine in Texas,

receiving regular shipments from Phillips, and Taylor delivered cocaine to addresses in Buffalo

(id.).

Agents then interviewed Fields at Buffalo Police Headquarters (id., Ex. C).  There, she

repeated that she knew Taylor sold large quantities of cocaine, approximately half kilogram in

the mail monthly (id. at 1).  Taylor would mail cocaine from Houston to various addresses in

Buffalo (id.).  Asked whom Taylor supplied with cocaine, Fields answered that Phillips was

among Taylor's customers (id. at 2).  Fields then disclosed that Taylor possessed an AK-47

assault rifle and its possible location (id.).  Fields then signed a sworn statement memorializing

what she observed about Taylor's drug transactions and weapon possession (id.; Docket No. 137,

Gov't Post-Hearing Memo., Ex. A).

In his motion to suppress, Phillips consistently argues that he resided at 328 Landon or

had a privacy interest in that premises (e.g., Docket No. 88, Phillips [Second] Reply, Ex. A,

Phillips Aff., sworn to Sept. 26, 2016; Docket No. 60, Phillips Def. Atty. Affirm., Ex., Phillips

Affirm. sworn to June 8, 2016; see also Docket No. 67, Tillmon Affirm. ¶¶ 3-5; cf. Docket

No. 137, Gov't Post-Hearing Memo. at 8).  He claimed that his furniture and personal effects

were at 328 Landon (Docket No. 88, Phillips [Second] Reply, Ex. A, Phillips Aff.,).  Phillips'

mother, Shirley Tillmon, swore an affidavit claiming that he resided at 328 Landon from

March1, 2009, until July 2, 2015, when she arranged to move his personal property into storage

(Docket No. 89, Phillips [Third] Reply, Tillmon Aff., sworn to Sept. 30, 2016, and exhibit).

Although Fields had a key to 328 Landon, Phillips swore that she did not have permission to

have it or to keep her personal property there (Docket No. 60, Phillips Affirm. ¶¶ 7-8). Phillips refutes the Government's argument that he was not in Buffalo in a few years by listing air flights to Buffalo he had from May 2012 to March 2013 (Docket No. 84, Phillips Reply at 3-4, Ex. A).

*Suppression Hearing*

Phillips proposed to call (Docket No. 119)—and eventually did call (see Docket Nos. 127, Tr., May 4, 2017; 128, Tr., July 6, 2017)—Shirley Tillmon and a representative of the City of Buffalo Animal Shelter. He also proposed to call as witnesses a representative of Erie County Central Police Services, who Phillips did not call (see Docket No. 128, July 6, 2017, Tr. at 97), and himself (Docket No. 119), but he did not testify. Ms. Tillmon was to testify regarding her ownership of 328 Landon and her ceding control of that property to Phillips (id.). The Animal Shelter representative would testify about the shelter's activities on that date (see id.).

This Court makes its findings from the parties' proposed findings of fact (see Docket Nos. 135-37), the transcripts of the hearings (Docket Nos. 127 (May 4, 2017), 128 (July 6, 2017)), and the exhibits received during the hearing. On March 12, 2013, agents of the Drug Enforcement Administration executed search warrants, leading agents to 328 Landon and a white female (Fields fitting this basic description) who would have information about Phillips (see Docket No. 137, Gov't Post-Hearing Memo. at 4). The Government alleges that Phillips had been mailing kilograms of cocaine from Houston, Texas, to Buffalo while others would mail him back money (id.). Shirley Tillmon, Phillips' mother, owned 328 Landon (id.; Docket No. 135, Fields Post-Hearing Memo. at 2; Docket No. 67, Tillmon Affirm. ¶ 2).

After executing search warrants at other locations, agents watched 328 Landon, hoping to find someone who would potentially consent to a search in a "knock and talk" (Docket No. 128,

July 6, 2017, Tr. at 53; Docket No. 137, Gov't Post-Hearing Memo. at 4; Docket No. 135, Fields

Post-Hearing Memo. at 4).  There was no search warrant sought for this address (Docket No 127,

May 4, 2017, Tr. at 15 (Drug Enforcement Administration Special Agent David Leary); Docket

No. 128, July 6, 2017, Tr. at 43-44, 66-70 (Detective Eric Herrington); Docket No. 135, Fields

Post-Hearing Memo. at 3), with one agent conceding that after weeks of surveillance they did not

have enough evidence to seek a search warrant (Docket No. 127, May 4, 2017, Tr. at 101

(Leary)).  After seeing Fields leave 328 Landon, agents approached her.  The agents testified that

Fields consented to search 328 Landon.  (Docket No. 137, Gov't Post-Hearing Memo. at 4;

Docket No. 61, Gov't Response, Ex. A.)  Fields warned them that there were dogs inside, so the

agents called a City of Buffalo Animal Control officer to secure the dogs (Docket No. 137, Gov't

Post-Hearing Memo. at 4).

One of the agents who conducted surveillance of 328 Landon before March 12, 2013,

Special Agent David Leary, testified that he did not see Philips at that address (Docket No. 127,

May 4, 2017, Tr. at 17; Docket No. 137, Gov't Post-Hearing Memo. at 5).  Phillips lived at

3603 Fiddlers Green, Houston (Docket No. 137, Gov't Post-Hearing Memo. at 5; Docket

No. 127, May 4, 2017, Tr. at 174, 176 (Federal Bureau of Investigation ("FBI") Special Agent

Mark Schirching).  Agent Schirching testified that he went to this Houston address looking for

Phillips.  Hours after knocking on the door without an answer, Phillips' attorney called

Schirching.  (Docket No. 127, May 4, 2017, Tr. at 176.)

Agents Brian Chella and Mike Hall  asked Fields if she consented to search and she

agreed, executing the consent to search form (Docket No. 137, Gov't Post-Hearing Memo. at 9-

10; Docket No. 128, July 6, 2017, Tr. at 45, Gov't Ex. 1).  These agents, however, did <u>not</u> testify

6

at the suppression hearing.  Other agents testified to Fields' "laid back demeanor" (Docket No. 137, Gov't Post-Hearing Memo. at 10; see also Docket No. 135, Fields Post-Hearing Memo. at 7) during the consent to search, as well as later (Docket No. 137, Gov't Post-Hearing Memo. at 12-13; Docket No. 128, July 6, 2017, Tr. at 86-87 (Mulhern, Fields was cooperative and had a "pretty good" demeanor during her police headquarters questioning).  Fields was present inside 328 Landon during the search and one agent, Eric Herrington, concluded, "she seemed like she was in control of the residence" during the search (Docket No. 137, Gov't Post-Hearing Memo. at 10-11; Docket No. 128, July 6, 2017, Tr. at 79).

Fields in a sworn statement claimed that, upon leaving 328 Landon agents detained and handcuffed her (see Docket No. 137, Gov't Post-Hearing Memo. at 11; Docket No. 68, Fields Aff. ¶¶ 3, 5).  Fields' friend, Katrina Price, testified during the hearing that Fields was handcuffed and put into Price's vehicle (Docket No. 128, July 6, 2017, Tr. at 129; Docket No. 137, Gov't Post-Hearing Memo. at 11).  Fields testified to the Grand Jury, however, that she gave consent to the search (Docket No. 137, Gov't Post-Hearing Memo. at 11, citing Gov't Ex. 28, page 8).  Buffalo Police Detective Sergeant Timothy Mulhern testified that, after the search ended, he arrested Fields, handcuffed her, and advised her of her rights (Docket No. 137, Gov't Post-Hearing Memo. at 12).

*328 Landon and Phillips' Residence*

Fields testified before the Grand Jury (Docket No. 137, Gov't Post-Hearing Memo. at 6, citing Gov't Ex. 28), and made a written statement that Phillips lived in Houston (id.; Docket No. 127, May 4, 2017, Tr. at 61 (Leary)). Fields then testified to the Grand Jury that Phillips rarely visited 328 Landon and that no one lived there (Docket No. 127, May 4, 2017, Tr. at 62-63; Docket No. 137, Gov't Post-Hearing Memo. at 6; Gov't Ex. 28). Fields testified that of the adult dogs found at 328 Landon, one was hers, two were Phillips and one was John Taylor's (Docket No. 127, May 4, 2017, Tr. at 34; Docket No. 137, Gov't Post-Hearing Memo. at 6-7).

The Government cites various utility bills found at 328 Landon, none of which was in Phillips' name (Docket No. 137, Gov't Post-Hearing Memo. at 7; see Docket No. 127, May 4, 2017, Tr. at 46, Gov't Exs. 9-11). Phillips, however, had multiple utilities in his name for the 363 Fiddlers Green address (Docket No. 137, Gov't Post-Hearing Memo. at 7; see Docket No. 128, July 6, 2017 Tr. at 38, Gov't Ex. 30). Internal Revenue special agent Dave Turri testified and introduced various IRS documents for Phillips or his business interests that were addressed to the North Parade address of his mother (Docket No. 127, May 4, 2017, Tr. at 126-53, 133).

Shirley Tillmon resides at 59 North Parade Avenue, Buffalo; Phillips had an Internal Revenue Service document addressed to him at 59 North Parade (Docket No. 127, May 4, 2017, Tr. at 54, Gov't Ex. 12; see id., Tr. at 126-48 (IRS Special Agent David Turri)). Tillmon testified that Phillips spent the night at 59 North Parade (Docket No. 127, May 4, 2017, Tr. at 161 (Tillmon); Docket No. 137, Gov't Post-Hearing Memo. at 7). She knew that Phillips lived in Texas and that he would be away from Buffalo at long stretches (Docket No 127, May 4,

2017, Tr. at 160 (Tillmon); Docket No 137, Gov't Post-Hearing Memo. at 8). Tillmon stated she never saw Phillips at 328 Landon (Docket No. 127, May 4, 2017, Tr. at 160; Docket No. 137, Gov't Post-Hearing Memo. at 8).

Defendants did not testify at the hearing.

*Contentions*

The Government argues that Phillips had no expectation of privacy or property interest in 328 Landon to have standing to contest the search. Furthermore, Fields, the only person who came from that address on March 12, 2013, consented to the search and had apparent authority to do so.

Phillips terms the atmosphere during the search and aftermath as "an aggressive, overwhelming police pressure intended to intimidate whomever the agents encountered" (Docket No. 136, Phillips Post-Hearing Memo. at 5). Fields argues that after her release by the agents, she met with Price and cried and told her what happened to her that day (Docket No. 135, Fields Post-Hearing Memo. at 10; Docket No. 128, July 6, 2017, Tr. at 130-32), concluding that whatever "perceived consent had been coerced" (Docket No 135, Fields Post-Hearing Memo. at 10). Fields claim that she was subject to an extended period of unauthorized detention and a display of "an overwhelming display of force" when she purportedly consented to the search of both Landon Street and her storage locker in Houston (id. at 11).

9

**DISCUSSION**

I.    Archie Phillips' Motion to Suppress Evidence from 328 Landon

    A.    His Standing to Contest the Search at 328 Landon

From review of the record, there is no basis for the claim that Phillips "owned" 328 Landon; his mother had title.  There are no utility bills for that property in Phillips' name, despite his claim that he arranged with his mother to be responsible for the bills there.  He claims that electric bills were in Phillips' name (Docket No. 88, Phillips [Second] Reply, Phillips Aff.), but he did not introduce into evidence examples of electric bills in his name.  As noted elsewhere in this Report, Fields had the electric bill in her name.

At best, Phillips resided there for brief periods (Docket No. 60, Ex. A, Phillips Aff., where he claimed to live at 328 Landon).  Tillmon in one of her sworn statements stated that 328 Landon was "one of my sons [sic] residences" (Docket No. 67, Tillmon Affirm. ¶ 3).  This Court finds that the testimony that he actually stayed at his mother's house on 52 North Parade when in Buffalo is credible.  Although Tillmon stated in her affidavit that Phillips lived at 328 Landon during his visits to Buffalo (Docket No. 84, Tillmon Aff. at 1-2), and he frequently returned to Buffalo to stay at 328 Landon (id. at 3-4, Ex. (listing of travel to Buffalo), there is no indication where he stayed during those trips.  The defense did not present an affidavit from anyone knowledgeable on this point or elicit testimony on this during the hearing.

Phillips did keep his personal property there, including his dogs and furniture his mother later placed in storage (Docket No. 89, Phillips [Third] Reply, Tillmon Aff., Ex. A).  Agents testified to finding letters in the kitchen (Docket No. 127, May 4, 2017, Tr. at 36 (Leary)).  He contends that his "Important papers and personal belongings [sic]" were kept there (Docket

No. 88, Phillips [Second] Reply, Phillips Aff.; Docket No. 60, Phillips Aff. ¶ 4; <u>see</u> Docket No. 67, Tillmon Affirm. ¶ 5).

The Government argues (Docket No. 61, Gov't Phillips, at 15-16) that Phillips lacks standing to contest the search of 328 Landon, arguing that Phillips had not presented evidence to corroborate that he lived there in March 2013. The Government points out that Tillmon owned the property (<u>id.</u> at 16, Exs. D (City assessment records), E (County tax records)), utilities were in names of others (<u>id.</u> at 16, Ex. F (National Fuel bill in John Taylor's name); Gov't Exs. 10, 11 (National Fuel bills in in Taylor's name; <u>see also</u> Docket No. 127, May 4, 2017, Tr., at 46, receiving in evidence Gov't Ex. 9 (National Grid bill in Beverly Fields' name for 328 Landon)). The Government also relies upon Fields' Grand Jury testimony that no one lived at 328 Landon (Gov't Ex. 28), and that Phillips lived in Houston and had not resided in Buffalo in years. While Phillips still had a key, Fields testified that he rarely went there. The Government concludes that Phillips did not establish that he owned or occupied 328 Landon (Docket No. 137, Gov't Post-Hearing Memo. at 16 (citing First Circuit case, <u>United States v. Gomez</u>, 770 F.2d 251, 254-55 (1985), that person living elsewhere for months lacked expectation of privacy in premises)).

This Court finds that Phillips did not reside at 328 Landon in March 2013. That property effectively ceased to be a residence; instead, it was a kennel or a storage space. Phillips resided primarily in Houston and stayed with mother at North Parade address when he came to Buffalo. Most of the utilities at 328 Landon were not in Phillips' name; title to that property was in Shirley Tillmon's name as rental property. The IRS mailings to Phillips were either to his Houston address or to North Parade. All of these facts indicate few connections between Phillips and 328 Landon.

Nevertheless, Phillips has a privacy interest in the storage of his property at 328 Landon, e.g., his dogs, personal property and effects.  The Government does not dispute Phillips' ownership of the dogs or personal property found at 328 Landon.  An expectation of privacy can arise in rented storage space, United States v. Johns, 851 F.2d 1131, 1136 (9th Cir. 1988); United States v. Hamilton, 538 F.3d 162, 169 (2d Cir. 2008) (no authority for proposition that one must live in premises to enjoy privacy interest for premises; e.g., businesses, storage lockers), corrected, 2008 U.S. App. LEXIS 23080, at *16-18 (2d Cir. Aug. 15, 2008); see United States v. Eldridge, No. 09CR329, 2012 U.S. Dist. LEXIS 81442, at *11-12 (W.D.N.Y. June 12, 2012) (Scott, Mag. J.) (Second Circuit recognizes that individual has expectation of privacy in property placed in storage, recognized by society whether or not a storage fee is paid).  In Hamilton, supra, 538 F.3d at 168-69, the Second Circuit, accepting defendant's allegations as true and construing them in the light most favorable to him, found that the defendant had "solid expectation of privacy" at searched house from defendant's free and frequent access and effective control of premises.  That case was remanded for further consideration of suppression motion, id.; but cf. United States v. Gerena, 662 F. Supp. 1260, 1262-63 (D. Conn. 1987) (sporadic visits belie claim to ownership warranting standing to contest search) (Docket No. 137, Gov't Post-Hearing Memo. at 15-16).  In United States v. Filippi, No. 12 Cr. 604, 2013 U.S. Dist. LEXIS 144325 (S.D.N.Y. Oct. 4, 2013), defendant moved to suppress an affidavit stating that for several months he stored clothes and other personal items in the searched warehouse and had the power to determine who could have access to the warehouse.  The district court held that this defendant had sufficiently satisfied his burden to show that he had a legitimate expectation of privacy and thus had standing to move to suppress evidence seized from that warehouse.

2013 U.S. Dist. LEXIS 144325, at *3 (see Docket No. 88, Phillips [Second] Reply at 1), citing Rakas v. Illinois, 439 U.S. 128, 143 (1978); Hamilton, supra, 538 F.3d at 167-68.  Guests at premises also have expectation of privacy, Minnesota v. Olson, 495 U.S. 91, 99 (1990); see also Nieves v. New York City Police Dep't, 716 F. Supp.2d 299, 307 & n.67 (S.D.N.Y. 2010) (citing Jones v. United States, 362 U.S. 257, 259 (1960), legitimate expectation of privacy established where party had key to apartment, personal possessions stored there, and occasionally spent the night there).

Here, Phillips may not have resided at 328 Landon but he certainly used it as a kennel and storage space.  In addition to his dogs, Phillips left his furniture and personal effects there.  He gave access to enter the premises to Fields, although he now argues that he renounces that authorization; the fact that he can make those arrangements shows that he has an interest in the property to the exclusion of the rest of the world.  He had an arrangement with the title owner of 328 Landon (his mother) to maintain that property, "be responsible for taxes, water, sewer, etc.," with this arrangement in lieu of rent, with any sub rent to be paid to her (Docket No. 89, Phillips [Third] Reply, Tillmon Aff.; see Docket No. 88, Phillips [Second] Reply, Ex., Phillips Aff. of Sept. 26, 2017).  Actually, the utilities cited to this Court billed others.  Phillips nevertheless expected privacy for the items of his property stored at Landon.  Phillips thus **has standing** to challenge search.

B.    Suppression of Evidence from Search of 328 Landon

Phillips then contests Fields' authority to authorize the search of 328 Landon.  He also seeks to suppress statements he made, but there is no record of him making incriminating statements or that the Government intends to use his statements against him.  Separately, Phillips

13

wants to suppress statements Phillips made during a proffer session while he was represented by Mark Allenbaugh, a now suspended attorney in this District. Phillips also wants to suppress any statements obtained from wiretaps.

1.    Expectation of Privacy

The Government argues that both defendants lacked any expectation of privacy in 328 Landon (an abandoned property) (Docket No. 137, Gov't Post-Hearing Memo. re Phillips at 13-18; Docket No. 80, Gov't Response at 3-4 (reserving right to argue that Fields lacked any expectation of privacy); but cf. Docket No. 62, Gov't Fields at 13 (conceding that Fields had standing as to Landon Street and Houston). It contends that Phillips did not live there (either living in Houston or staying with his mother on North Parade Avenue, whenever he was in Buffalo) (Docket No. 137, Gov't Post-Hearing Memo. at 15, 17). The Government also excludes Fields' interest, although she is not moving to suppress evidence seized under her signed consent or asserting an expectation of privacy.

As found above, however, Phillips **had an expectation of privacy** since he used 328 Landon as a storage facility for his personal property. Fields, while not claiming a privacy interest there, may in fact have one. The same expectation of privacy Phillips has in storing his animals is the same that Fields would enjoy for her animal housed there at that site as well (Docket No. 55, Fields Aff. ¶ 2 (disclaiming residing there but claiming that her dog did). Much of the hearing concerned the authority to remove her dog (and the others) prior to the agents' entry to conduct their search.

2.      Fields' Authority to Consent to Search

Phillips argues that Fields had no authority to consent to search 328 Landon, that Phillips as "sole resident" and "owner" of that property denied her authorized access.  Fields nevertheless signed a consent to search form believing that it was for an acknowledgement of a search already conducted.  She also denied residing at 328 Landon, although agents spotted her leaving that property and she had a key to it.  This Court notes that one of the hearing exhibits, Government Ex. 9 (received Docket No. 127, May 4, 2017, Tr. at 46), is an electric bill for 328 Landon in Fields' name.

As discussed above, there is no basis for the claim that Phillips "owned" 328 Landon; his mother had title.  At best, he may have resided there on occasion (Docket No. 60, Ex. A, Phillips (first) Aff. (signed version of No. 57, Ex. A) and Fields (formerly in relationship with Phillips) entered without permission, with Fields finding a (spare) key and entered anyway.  The proof here showed that Phillips resided either in Houston or at his mother's home on North Parade Avenue.

The Government argues that Fields consented to search (Docket No. 61, Phillips Response at 16-17, Ex. B, ¶ 2 (Drug Enforcement Administration Report of Investigation, Mar. 19, 2013, her dog lived there, she had the key; see id. she had her personal belongings in there)).  Even if Fields lacked actual authority to consent, the Government concludes that she reasonably had apparent authority to consent (id. at 17; Docket No. 137, Gov't Post-Hearing Memo. at 20), see United States v. Matlock, 415 U.S. 164, 171 (1974) (third party who maintains common authority over premises may consent to its search).

Phillips used 328 Landon as a kennel and storage area, but so did Fields. There was no testimony that a particular space there was designated for Phillips' exclusive use. Phillips contends that Fields was his ex-girlfriend and was no longer authorized to enter 328 Landon; nevertheless, she still had access to the key and used it, storing her dog among Phillips' animals. To the agents, Fields had at least apparent authority to authorize their entry, see Illinois v. Rodriguez, 497 U.S. 177, 188 (1990); United States v. McGee, 564 F.3d 136, 139 (2d Cir. 2009) (Docket No. 61, Gov't Phillips at 17). Therefore, Fields as essentially co-tenant for the kennel/storage space could authorize its search. Phillips' motion to suppress evidence based upon Fields' lack of authority to consent (Docket No. 57) should be **denied**.

        3.      Voluntariness of Fields' Consent

Phillips argues that the totality of the circumstances were coercive and Fields did not freely sign the consent form. Fields also points to a number of facts to be considered in finding that her consent here was coerced. First, she closed the door upon the approach of agents Hill and Chella (Docket No. 135, Fields Post-Hearing Memo. at 13). Second, the police made Fields stand outside during the cold March day as the dogs were removed and search was conducted, contending that the choice to remain outside was the agents and not hers (id.). Third, she did not want her dog or the other dogs removed and sent to the pound (id. at 14). Fourth, she was followed by a police officer (not her choice) (id.). Fifth, the police witnesses do not recall whether (or when) she was handcuffed (id.; cf. Docket No. 128, July 6, 2017, Tr. at 46), while Price testified that Fields was in cuffs when Price arrived (Docket No. 135, Fields Post-Hearing Memo. at 14). Sixth, Fields did not ask to have Price detained and her truck searched during a portion of the Landon search (id. at 14-15). Finally, seventh, Fields contrasts how the police

16

treat "cooperative" person with the treatment she received or how the police treat other "uncooperative people" (id. at 15).  Fields concludes that the circumstances showed "overwhelming coercion" given the number of agents (10-12) during the search and the exercise of authority displayed (id. at 3, 16).  As Price testified (Docket No. 128, July 6, 2017, Tr. at 110; see Docket No. 135, Fields Post-Hearing Memo. at 16-17), any protest of the police activities would have been futile.  Fields also points out agents Chella and Hill did not testify at the hearing (Docket No. 135, Fields Post-Hearing Memo. at 17).  She explained her Grand Jury testimony admitting that she signed the consent to search form by claiming that she was not asked if that consent was voluntary (id. at 20-21).  She concludes that she was scarred (id. at 16) but Fields did not testify and her fear is discussed in the testimony of her friend, Price, relating how Fields (hours later) told her harrowing experiences with law enforcement after her release (Docket No. 128, July 6, 2017, Tr. at 130-32, 114; Docket No. 135, Fields Post-Hearing Memo. at 10).

The Government denies any coercion, noting that Fields was not handcuffed when she was asked to sign the consent form to search at Landon Street (Docket No 137, Gov't Post-Hearing Memo. at 10-11, 19) and Fields assisted the agents in answering their questions during the search.  At that time, she signed two consent to search forms in all (for Landon Street and for her storage unit in Texas) (see Docket No. 137, Gov't Post-Hearing Memo. at 19).

"Whether an individual has consented to a search is a question of fact to be determined by the totality of all the circumstances," United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993) (internal citations omitted) (Docket No. 137, Gov't Post-Hearing Memo. at 18).  Consent is truly voluntary if that "consent is the product of free and unconstrained choice rather than a mere

acquiescence to a show of authority or the product of coercion or inappropriate threats" (Docket No. 135, Fields Post-Hearing Memo. at 13), see Schneckloth v. Bustamonte, 412 U.S. 218, 219, 222 (1973). Fields argues that the Government has the burden of showing that her consent was voluntary (Docket No. 135, Fields Post-Hearing Memo. at 17).

In her post-hearing brief, Fields concedes that her consent to search was voluntary (Docket No. 135, Fields Post-Hearing Memo. at 6, 7; but cf. id. at 7 (Fields not consenting to seizure of dogs)). The testimony has a discrepancy whether (or when) Fields was handcuffed relative to when Fields signed the consent to search form for 328 Landon or whether agents acknowledged the presence of her friend Price. Price states that Fields was handcuffed during Price's time with her. Herrington, who witnessed Fields signature on the consent to search 328 Landon, testified that she was not handcuffed (Docket No. 128, July 6, 2017, Tr. at 45-46) and that he did not recall seeing Price or her truck (or the search, including a canine sweep of the truck) (id. at 60). Mulhern testified that he handcuffed Fields as he arrested her after conducting the search and then advised her of her rights (Docket No. 137, Gov't Post-Hearing Memo. at 12; Docket No. 128, July 6, 2017, Tr. at 80, 82-83), which would have been after Fields executed the consent form (id. at 83 (Mulhern)). The agents' testimony about Fields' demeanor, relaxed, smoking with officers awaiting the arrival of Animal Control, belie any coercion or overborne will. It is also not credible that police officers would allow a handcuffed suspect into a civilian's vehicle (even if the agents possessed the car keys for that vehicle) as Price testified (cf. Docket No. 128, July 6, 2017, Tr. at 129). Again, as noted by the Government (Docket No. 137, Post-Hearing Memo. at 11), Fields does not mention being in Price's truck during this search. Fields' earlier affidavit about being placed in an "unmarked pickup truck" (Docket No. 68, Fields Aff.

¶ 6), is not identified as Price's and it implicitly is supposed to be a police vehicle rather than a civilian's.

Considering the totality of the circumstances here, Fields' consent to search, her statements during the search and later at police headquarters were voluntary. Although there was a show of police authority, Fields had more concern about the seizure of her dog (and the other dogs at 328 Landon) and less upon whether her will was being overborne in consenting to the search or making her statements. Fields signed the consent to search (as she testified before the Grand Jury) and (after the search was concluded) was arrested and handcuffed. Although she later told her friend differently, Fields' demeanor during the search and subsequent questioning was cooperative, laid back, and under control. If this Court accepts her contention that the authorities treat cooperative witnesses differently from non-cooperative ones, the evidence shows that her treatment during the search was the implicitly milder form for those who cooperate. Considering all these circumstances, this Court finds that Fields **voluntarily consented to search 328 Landon**.

4.      Conclusion

Although neither defendant resided at 328 Landon, it served as their storage facility and kennel. That use gives them a privacy interest and (for Phillips) standing to contest the search. That use also gave Fields at least apparent authority to authorize its search. Fields exercised that authority and voluntarily consented to the search. Phillips' motion (Docket No. 57) to suppress evidence from that search should be **denied**.

19

C.      Suppress Wiretap Materials (No. 71).

Phillips supplemented his suppression motion with a motion to suppress wiretap evidence from a cellphone used by his brother, Mashi Phillips ("Mashi") (Docket No. 71, Def. Atty. Affirm. ¶¶ 6-10, 17-35), namely two intercepted calls[3] involving him from Mashi's wiretapped cellphone (id. ¶¶ 6, 8).  Here, he renews his argument for suppression of evidence found at 328 Landon because the search of those premises was due to this wiretap (id. ¶ 13).  Phillips contends that the wiretap Order was not supported by probable cause; that necessity for the wiretap was not shown; and that a Franks hearing was required, see Franks v. Delaware, 438 U.S. 154 (1978), regarding the supporting affidavits for the wiretap Order (id. ¶¶ 15-23, 24-35, 38-44, 45-48; cf. Docket No. 79, Gov't Response at 5).

Phillips later submitted ex parte and apparently pro se affidavit (as well as Bradley's affidavit) regarding these recorded calls (see Docket No. 127, May 4, 2017, Tr. at 178, Gov't Exs. 20, 21, 20TX, 21TX).  This Court has not considered the ex parte submissions and defense counsel has not adopted them as part of Phillips' present motion (see Docket No 142).

The Government argues that there was probable cause for the wiretap, based upon the narcotics transactions of Mashi, the target of the wiretap.  That probable cause was Mashi's prior drug transactions, including purchases by a confidential source from him.  (Docket No. 79, Gov't Response at 5-10; see Docket No. 127, May 4, 2017, Tr. at 99-100 (Leary).)  Further, the Government points to the necessity of the wiretap (id at 10-16), and argues that there is no need for a Franks hearing (id. at 16-17), cf. Franks, supra, 438 U.S. 154.

---

[3]On December 26, 2012, and January 3, 2013, Docket No. 71, Phillips Atty. Affirm. ¶ 8.

       1.     Probable Cause

Eavesdrop warrants are issued only upon a showing of probable cause that an individual (here Mashi) had committed one of the enumerated offenses under the statute, that communications relevant to that offense would be intercepted by the wiretap, and that the facilities surveilled were being used in furtherance of criminal conduct, 18 U.S.C. §§ 2518(1)(b), (3)(a), (b), (d), 2516 (Docket No. 71, Phillips Atty. Affirm. ¶ 15).  As with issuance of a search warrant, probable cause for issuance of a wiretap Order is assessed on the totality of circumstances, United States v. Wagner, 989 F.2d 69, 71 (2d Cir. 1993) (Docket No. 79, Gov't Response at 6), with this Court according substantial deference to the decisions of the issuing court (id. at 7), United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990).

The application for the wiretap contained an affidavit of Drug Enforcement Administration special agent Shane Nastoff outlining the drug trafficking conspiracy of Mashi and others (id. at 8), including defendant Archie Phillips.  The affidavit was based upon information from three confidential sources, including one source (identified as "CS-3") who made controlled calls to Mashi relating to a cocaine purchase (id.).  Phillips argues that CS-3's first drug transaction with Mashi was unorthodox (Docket No. 71, Phillips Atty. Affirm. ¶ 21) and thus not a sufficient basis for probable cause.  On one transaction, CS-3 had obtained cocaine from Mashi in advance of his payment for it, and DEA agents gave him part of the money for a controlled purchase.  Phillips argues that this unusual transaction should diminish probable cause for the warrant (id.).

By mentioning a "first" drug transaction implies that others are mentioned in Agent Nastoff's affidavit.  A review by this Court finds that CS-3 identified Mashi as "DOG" one of

two individuals who controlled cocaine distribution on French Street, also identifying Mashi's car and the house he used for distributing cocaine. CS-3 stated that Mashi obtained cocaine from out of state from a source named Archie, that Archie was related to Mashi; when shown a photograph, CS-3 positively identified defendant Archie Phillips.

As for the partial payment by controlled funds, agents met again with CS-3 and recorded follow up calls from Mashi (on the cellphone that was later wiretapped) to collect the balance and to make a second, controlled purchase. These transactions occurred before the December 26, 2012, telephone call Phillips seeks to suppress.

Another informant, CS-1, reported that a co-conspirator Skipper received shipments of cocaine from a distributor named "Archie," while another informant, CS-2, identified Archie as being connected with the drug operation on Box Avenue and French Street and that Archie was a major source for cocaine. Nastoff also based his affidavit upon his own surveillance.

Phillips now argues that CS-3 claiming that he was the source of cocaine in the Box-French area contradicted what CS-2 said, that the Bloods controlled cocaine distribution in that area (Docket No. 71, Phillips Affirm. ¶ 19). This does not diminish the probable cause for issuing the wiretap; the fact that others engaged in rival drug trafficking does not preclude Phillips or Mashi from also engaging in that activity.

Thus, from the totality of the circumstances, there was **probable cause for the wiretap ordered here**.

    2.  Necessity for Wiretap

Agent Nastoff claimed in his affidavit that normal investigative procedures had been tried and had failed and that techniques that were used could not identify the identities of all

participants and conspirators in the Box-French cocaine conspiracy. That affidavit provides a full and complete statement of investigative procedures that have been tried and failed, 18 U.S.C. § 2518(c)(1), while establishing the roles of Mashi and Skipper those conventional methods may not identify others in the conspiracy (see Docket No. 79, Gov't Memo. at 10). Nastoff lists review of toll records, pen registers, use of confidential informants for controlled purchases, surveillance, and GPS tracking as methods that were used and noted other methods (convening a Grand Jury, interview of subjects, a garbage pull, and execution of search warrants) that were considered but deemed not likely to succeed. As a result, the Government established the **necessity** for the wiretap.

        3.     Need for a <u>Franks</u> Hearing

Phillips contends that Nastoff falsely memorialized the effectiveness of other investigative methods to justify using a wiretap (Docket No. 71, Phillips Atty. Affirm. ¶ 46; cf. Docket No. 79, Gov't Memo. at 16). The <u>Franks</u> Court held that there is "a presumption of validity with respect to the affidavit supporting the search warrant," 438 U.S. at 171. To gain a hearing, "there must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof," <u>id.</u>, following "a suitable preliminary proffer of material falsity," <u>id.</u> at 169. The purported falsehood Phillips argues, however, is not material. Phillips merely disagrees with the efficacy of the investigative methods listed by Nastoff (both those applied and those merely considered). Phillips has not shown that Nastoff and other agents had means to learn all the participants of the conspiracy short of wiretaps.

Thus, on this record there is **no need for a <u>Franks</u> hearing**.

4.    Conclusion

Therefore, Phillips' motion to suppress the wiretap evidence (Docket No. 71) should be **denied**.

II.    Suppress Proffer Statements (No. 71).

Phillips moves to suppress statements made during his proffer on December 4, 2014 (Docket No. 71, Phillips Def. Atty. Affirm. ¶ 50; see Gov't Ex. 23), after his then attorney, Mark Allenbaugh, was suspended by the Fourth Circuit on September 11, 2014 (Docket No. 71, Phillips Def. Atty. Affirm. ¶¶ 50-58), and presumably suspended in this District by reciprocity. He wants to preclude using the proffer, including for impeachment (id. ¶ 58). Phillips contends that his proffer statements should be suppressed because he was represented by an attorney, Mark Allenbaugh, who was suspended from practice in this District

A brief history of Mr. Allenbaugh's representation and his admission status in this Court (and in other jurisdictions) is in order. Defendant argues that he retained Allenbaugh in 2012, but Allenbaugh then was not yet admitted to practice before this Court (Docket No. 84, Phillips Memo. at 5). This Court admitted Allenbaugh on August 7, 2014. Allenbaugh appeared for Phillips on September 4, 2015 (Docket No. 28).

Meanwhile on September 11, 2014, the United States Court of Appeals for the Fourth Circuit suspended Allenbaugh. Reciprocally other courts later suspended or disbarred Allenbaugh: the Commonwealth of Virginia on December 29, 2014; the District of Columbia Court of Appeals on January 21, 2015, preliminarily and then fully on May 7, 2015 (Docket No. 84, Phillips Memo. at 5). After his appearance in this case, on March 1, 2016, the United

States Supreme Court also suspended Allenbaugh.  On March 14, 2016, this Court also reciprocally suspended Mr. Allenbaugh (see Docket No. 50).

The proffer Phillips now wishes suppressed occurred on December 5, 2014, during what he terms a debriefing (Docket No. 84, Phillips Memo. at 5; see Gov't Ex. 23).  At the time of this debriefing, Allenbaugh was a member in good standing of the bar of this Court, despite his suspension by the Fourth Circuit.  Other jurisdictions within the Fourth Circuit or near it also had yet to suspend Allenbaugh.  The Government argues that Allenbaugh's suspension was three months after the proffer and thus Phillips' statements from that proffer should not be suppressed (Docket No. 79, Gov't Response at 17, 18).

The Order suspending Allenbaugh (Docket No. 50) does not specify its effective date.  That Order also does not state whether it was retroactive to when other courts reciprocally suspended him.  This Court's Local Civil Rule 83.3(d), governing discipline for admitted attorneys in civil and criminal cases in this Court, see W.D.N.Y. Loc. Crim. R. 44(a), provides that upon receipt of a suspension Order of another jurisdiction, this Court will issue "an order disciplining the attorney to the same extent as imposed in the other jurisdiction," W.D.N.Y. Loc. Civ. R. 83.3(d).  Rule 83.3(d) also required Allenbaugh (or other disciplined counsel) to notify this Court in writing of the other court's suspension or discipline, id., which Allenbaugh did not do in this instance.

This Local Civil Rule does not state the effective date of this Court's reciprocal discipline.  Would a sanction run as of the date the first court acted or when this Court imposes its own sanction?  Rule 83.3(d) implies that, absent an affirmative act to the contrary, this Court suspends an attorney only when it learns of his discipline in other jurisdictions, with that

suspension being effective as on the date this Court acts. As in Allenbaugh's case, this Court learned of the first court's discipline months after it was imposed.

A similar case to Allenbaugh's suspension is the reciprocal discipline imposed by the Second Circuit in In re Bernfeld, 774 F.3d 169 (2d Cir. 2014) (per curiam). There, the attorney was suspended by the New York State Supreme Court Appellate Division, First Department, on March 27, 2014, for three months. The attorney, however, did not file a copy of the suspension Order with the Second Circuit until August 2014, over three months later when he sought reciprocal discipline to run concurrently with the First Department's order, id. at 170, 172, in effect after the run of the First Department's suspension. The Second Circuit instead imposed its own three-month suspension after the First Department's sanction ended, id. at 170. The Second Circuit rejected that attorney's motion for reinstatement after the First Department reinstated him, id. at 170-73. Applying Second Circuit Local Rule 46.2(c), the Second Circuit held that the attorney's delay in notifying that Court of his suspension had consequences, 774 F.3d at 171-72 (Local Rule 46.2(c) requires an attorney to notify the court within 28 days of filing of the discipline order). The Second Circuit found that its "reciprocal suspension orders generally are not imposed nunc pro tunc to the date of the original disciplinary order (although the Court may do so in the exercise of its informed discretion). An attorney wishing to have this Court's reciprocal suspension imposed as near as possible to the time of the imposition of the original suspension is advised to quickly inform this Court of the original suspension," id. at 172.

In this case, this Court's Order suspending Allenbaugh expressly was not imposed nunc pro tunc from the September 2014 suspension by the Fourth Circuit. By a plain reading, this Court's reciprocal suspension Order was effective as of **March 14, 2016**, when it was entered

and months after the proffer at issue.  In effect, this may create a grace period for Allenbaugh to continue practicing in this District for months after he was suspended elsewhere.  But for Allenbaugh's failure to notify this Court under his obligation under Local Rule 83.3(d) of changes in his admission status or this Court learning sooner of his suspension in another federal court, he continued to represent Phillips before this Court learned of his suspension.  In entering the reciprocal suspension Order, this Court could have made the effective date of this suspension earlier (even to match the effective date of the Fourth Circuit's Order) or have it run, <u>nunc pro tunc</u>, from the date of the Fourth Circuit's suspension; instead, the Order's effective date was not addressed.

The issue now is whether Allenbaugh's erstwhile client, Phillips, can benefit from this omission by having the proffer statement made with Allenbaugh as counsel suppressed.  Phillips does not cite authority that would make Allenbaugh automatically suspended in all federal courts upon his suspension in one federal court.  Each federal court must learn of the disqualifying action and determine for itself whether to sanction the attorney suspended by its sibling court.  This Court, like others, puts some onus on the member attorney to notify the Court of discipline in other jurisdictions.  Thus, disciplined attorneys have little incentive (aside from honesty and professionalism) to inform all other courts of admission of his or her discipline.  Relying upon an honor system and the Court's own research (mostly coincidental) leads to situations such as this where the second court (here this District) learns of the suspension in the first jurisdiction eventually, all the while the suspended attorney may still practice in the second jurisdiction.  For example, the Southern and Eastern Districts of New York wait twenty-four days before reciprocally disciplining a member of their bars who was disciplined in another court, S. &

E.D.N.Y. Loc. Civ. R. 1.5(d)(1); see also 2d Cir. R. 46.2(c)(2) (Second Circuit's reciprocal order effective 28 days after filing), and has provision for those courts' consideration of the appropriate discipline, S. & E.D.N.Y. Loc. Civ. R. 1.5(d)(1). This scheme thus does not appear to call for nationwide sanction upon the discipline of the first jurisdiction.

Phillips essentially moves to suppress based upon not having counsel of record in good standing to advise him when he made the proffer. Phillips, however, presents no authority requiring suppression in this situation (Docket No. 79, Gov't Phillips Memo. at 18; cf. Docket No. 84, Phillips Memo. at 5-6). In addition to the lack of authority, the Government counters two-fold: first, suppression of the proffer agreement now is premature (and would be relevant only if Phillips later testifies falsely or incompletely and the proffer agreement is used to refute him, see Docket No. 79, Gov't Phillips Memo. at 17); second, Phillips understood what he was doing during this proffer (id. at 18). The Government cites for the latter point prior proffer sessions with other counsel that Phillips made statements (id.).

On December 2014, Allenbaugh was still an attorney in good standing in this Court and could practice in this District, including appearances and representation of his client during the proffer. He was not yet suspended when the proffer occurred. While Phillips did not know Allenbaugh's admission status with other courts the Government also was unaware that Allenbaugh should have been suspended when the proffer occurred. From the timing of this Court's suspension Order, this Court also was not aware of Allenbaugh's status as of December 2014. The Government should not be penalized by the severe sanction of suppression for dealing with an attorney all believed to be duly admitted to practice in this District. Phillips is

not suggesting that the Government has the burden of confirming the admission status of his attorney prior to conducting the proffer.

Aside from the ripeness issue (seeking suspension when Phillips has not testified or testified contrary to the representations in the proffer), Phillips fails to show that he was prejudiced by having an otherwise suspended attorney represent him during the proffer. As the Government argues (Docket No. 79, Gov't Phillips Memo. at 18), this was the third proffer Phillips made with the Government; with the first two, Phillips was represented by another (duly admitted) attorney (see Gov't Ex. 22). Phillips does not claim that he was ineffectively assisted by Allenbaugh or was unaware of what he was doing during the December 2014 proffer. To suppress (at the right time) his proffer would require some prejudice arising from his representation status; Phillips fails to show that here. Furthermore, only one part of the proffer would be relevant now to this case; there, Phillips admits to shipping cocaine by mail from Houston to "JT" (John Taylor) by United States Mail (Gov't Ex. 23, proffer statement at page 3 of 4). Otherwise, consideration of suppression of the proffer statements would be premature.

Phillips' motion to suppress statements from his December 2014 proffer (Docket No. 71) should be **denied**.

## CONCLUSION

Based upon the above, it is recommended that defendant Archie Phillips' motion to suppress (Docket Nos. 57, 71) be **denied**. Due to defendant Beverly Fields' plea hearing (Docket No. 147), this Court **took no action** on her pending suppression motion (Docket No. 55).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72(b).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72(b), "[w]ritten objections to proposed findings of fact and recommendations for disposition submitted by a Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis

for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(b) may result in the District Court's refusal to consider the objection.**


       SO ORDERED.


                                      <u>   /s/ Hugh B. Scott</u>

                                             Hon. Hugh B. Scott
                                    United States Magistrate Judge


Dated: Buffalo, New York
       November 17, 2017